St. Louis-San Francisco Railway Co. *v.* Spencer.

5-1944                      328 S. W. 2d 858

Opinion delivered November 16, 1959.

*Warner, Warner & Ragon,* for appellant.

*Hubert L. Burch, John Wm. Murphy,* for appellee.

PAUL WARD, Associate Justice. This is a railway crossing accident case in which there was a jury verdict in favor of appellee. Appellant prosecutes this appeal for a reversal on the ground that there was no substantial evidence to support a submission to the jury. The basic facts and pleadings are substantially as set out hereafter.

Mrs. Beulah E. Harris and her husband, both elderly people, were returning from Winslow in a 1941 DeSoto automobile to their home. They left Highway No. 74 and proceeded to drive west on a private road for a distance of approximately 285 feet where the private road crossed the tracks of the St. Louis-San Francisco Railway Company, to their home. This said portion of the private road runs through a densely wooded area and just as it approaches the said crossing there is a 20% incline. When their automobile was crossing the railroad tracks it was struck by the front end of the engine attached to a freight train, belonging to appellant, proceeding from the north. As a result of the collision Mrs. Harris and her husband were both killed.

This action was instituted by Wayne Spencer as the administrator of the estate of Beulah E. Harris. Among other things it was alleged in substance that on June 8, 1958, Beulah E. Harris was riding in an automobile driven by her husband traveling west on a road near the town of Winslow, and that said automobile collided with appellant's southbound train, resulting in the death of Mrs. Harris. It was further alleged that Mrs. Harris' death was a result of the negligence of appellant's agents and employees in the following particulars: 1. They failed to keep a proper lookout as required by law; 2. They failed to give proper signals; 3. They failed to maintain the right-of-way free of trees, brush, weeds and grass which obscured the view of both the driver of the car and the operators of the engine; and 4. They

failed to keep the track in proper state of repair at said crossing. At the close of all of the testimony the trial court, without objection on the part of appellee, instructed the jury "that the allegations dealing with signals, and maintenance of right-of-way are withdrawn from your consideration and the only allegation of negligence presented to you concerns the matter of keeping a proper lookout".

For a reversal appellant relies on two designated points. One: There was no substantial evidence of violation of the lookout statute and the trial court erred in submitting the case to the jury on this issue. Two: The collision in question was the direct and proximate result of the negligence of the driver, (Mr.) Harris, and the contributory negligence of plaintiff's decedent, Mrs. Harris. Since we have concluded that the judgment of the trial court must be reversed on Point Number One we deem it unnecessary to discuss Point Number Two.

The testimony and the exhibits show that as appellant's railroad track approached the crossing from the north, it ran through a rather deep cut for approximately 500 feet which necessarily limited the view which the engine operators had of any automobile which might be approaching the crossing from the east. The freight train in question was being pulled by three diesel engines with an engineer and a fireman in charge of the front engine. The engineer was situated on the right side of the engine and the fireman on the left side of the engine. This arrangement placed the fireman on the side from which the Harris automobile was approaching the crossing and consequently gave him a better opportunity than the engineer had to discover the Harris automobile, and to do so sooner. The evidence reveals that the freight train was traveling at the rate of approximately 30 miles per hour and that the Harris automobile was traveling about one-third of that speed at the time of the accident.

Since Mr. and Mrs. Harris were both killed there were only three witnesses who testified relative to the kind of lookout that was observed by appellant's agents

and employees. Those witnesses were the engineer, the fireman, and a Mr. Marvin Anderson.

The testimony of the above witnesses was substantially as set out hereafter. James Hankins, the fireman, stated: On June 8th I was acting as fireman on the train that was involved in the accident; my job is on the left-hand side in the front seat of the engine and the cab is located about 12 feet back from the front of the engine; we were pulling a freight train of approximately 14 cars, part of which were loaded; we had three engine units on the train and three brakemen, two of which were riding in the second engine, one on the left and one on the right, and the third was riding with the conductor; I have been on this run about seven years and make it approximately three times a week; "I maintained a constant lookout ahead"; I first saw the Harris' car when the train was approximately 60 to 70 feet from the crossing and determined that it was not going to stop; I told the engineer to set the brakes; the engineer set the emergency brakes at approximately 45 to 50 feet from the crossing; the brakes were in good condition and remained on until we stopped; when I first saw the Harris' car it was approximately 35 feet from the crossing— I could tell someone was in the car but did not see how many or which way they were looking; the draw bar of the train hit the back door of the automobile on the right-hand side. E. Vincent, the engineer, testified: I have worked for appellant for 43 years; at the time of the collision I was in my seat on the right-hand side of the engine; the train was headed south which would put me on the west side of the track; at the time of the accident I was whistling for the crossing, after having whistled for the tunnel; the fireman hollered for me to "big-hole" the train, *i.e.*, put on the emergency brakes; I put on the emergency brakes when the train was from 45 to 50 feet from the crossing; the train made a good stop and only twelve cars passed the crossing; the emergency brakes were on from the time the fireman yelled at me and they were in good condition. Marvin Anderson testified: I operate a cafe on Highway 71 about 300

feet from the railroad track and about 1,000 feet away from where the Harrises live; on the day of the accident I heard the train whistle and I waved at a fireman or brakeman as the train went by and he waved back; the whistle blew a lot; I did not hear the impact but I did hear the train stop.

As the record stands we find no testimony to contradict the statement of the fireman that he maintained a constant lookout ahead, that he first saw the automobile when the train was about 70 feet from the crossing, that he promptly yelled to the engineer to set the emergency brakes; and there is no testimony in the record to contradict the engineer's statement that he applied the emergency brakes promptly when the fireman yelled at him to do so. On the other hand the fact that the brakes were set, as testified to by the engineer, about 45 or 50 feet from the crossing and the fact that the train actually stopped as quickly as it did, seemed to indicate that there was prompt action after the discovery of the peril on the part of both the fireman and the engineer. There is nothing in the record to indicate that either was negligent or dilatory, or that they could have done more than they did to prevent the collision. On the other hand some confirmation of the reasonableness of their testimony is found in the surrounding circumstances as they are revealed in the testimony and by the exhibits. From such source it clearly appears that the fireman's view was definitely limited by the ''cut'' through which the train approached the crossing, by the steep incline of the private road as it approaches the crossing, and from the trees that lined that portion of the private road. We find nothing substantial in the testimony of Marvin Anderson to indicate that the fireman, Hankins, was not keeping a constant lookout in accordance with his testimony. Anderson's testimony and the exhibits clearly show that if Hankins did wave at him he did so at a time and place which in no way prevented him from keeping a constant lookout when and where it would have been effective. In other words, Hankins could have waved at Anderson and still have maintained a proper lookout

for automobiles approaching the crossing in question. In addition, it is not clear from the testimony that Hankins was the man who waved at him. It could have been one of the brakemen mentioned in Hankins' testimony.

Arkansas Statutes, Section 73-1002, which imposes a duty upon those operating a train to keep a lookout, in all material parts, reads as follows: "It shall be the duty of all persons running trains in this State upon any railroad, to keep a constant lookout for persons and property upon the tracks of any and all railroads, and if any person or property shall be killed or injured by the neglect of any employee of any railroad to keep such lookout, the company owning or operating any such railroad, shall be liable and responsible to the person injured for all damages resulting from neglect to keep such lookout". In the case of *Kansas City Southern Railway Company* v. *Shane, Administratrix,* 225 Ark. 80, 279 S. W. 2d 284, this statement was made: "In construing Section 73-1002 above our rule appears to be well settled where an injury is caused by the operation of a railway train a *prima facie* case of negligence is made against the company operating such train and the burden rests on the company to show that it was not guilty of negligence". In that case it was stated that the statute in question creates a presumption or inference of negligence on the part of the railroad company. In the same case, however, the court approved what now appears to be the settled rule of this court to the effect that " 'The only legal effect of this inference is to cast upon the railway company the duty of producing some evidence to the contrary. When this is done, the inference is at an end, and the question of negligence is one for the jury upon all the evidence' ".

As we have pointed out above the fireman in this case testified that he kept a constant lookout, and, as said in the case of *St. Louis-San Francisco Railway Company* v. *Cole,* 181 Ark. 780, 27 S. W. 2d 992, "The jury could not arbitrarily disregard the testimony of the engineer and the fireman". It was likewise held in the case

of *St. Louis-San Francisco Railway Company* v. *Williams*, 180 Ark. 413, 215 S. W. 2d 611, that where an engineer testified that he kept a constant lookout and there was no testimony to the contrary, the burden of proof imposed by the statute upon the railroad company was therefore discharged.

In view of the above announced rules and in view of the record in this case as set forth above, we are bound to conclude that any burden resting upon appellant has been fully discharged and that appellee failed to show any actionable negligence on the part of appellant's employees. In the absence of any evidence the jury could only have speculated on why the deceased and her husband drove upon the railroad track in front of appellant's train. In the case of *St. Louis-San Francisco Railway Company, Thompson, Trustee* v. *Thurman*, 213 Ark. 840, 213 S. W. 2d 362, we said: "Verdicts cannot be founded on conjecture; negligence must be proved".

Since as heretofore pointed out the record shows conclusively that appellant's employees maintained a constant lookout in accordance with the statute heretofore mentioned and since there is no substantial evidence in the record to the contrary, and since the record contains no other evidence of any negligence on the part of appellant's employees relative to the only issue here presented, it must follow that the trial court was in error in submitting this case to the jury. Therefore, the judgment of the trial court is reversed and the cause of action is dismissed.

Reversed and dismissed.